## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:23-cr-00195 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | James E. Grimes, Jr. |
| MELVIN HODGE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

In this case, the indictment charges multiple defendants with various serious crimes as part of a conspiracy.  (ECF No. 1.)  Defendant Melvin Hodge brings two motions to suppress certain evidence and requests evidentiary hearings for both. (ECF No. 90; ECF No. 92; ECF No. 134 (supplemental briefing).)  The United States opposes each motion.  (ECF No. 110; ECF No. 111.)  Defendant also moves to compel production of certain materials in discovery.  (ECF No. 122).  In compliance with the Court's order, the United States did not file a brief in opposition to the motion to compel but did oppose it at oral argument.  (ECF No. 133, PageID #2639–45.)

## STATEMENT OF THE CASE

On April 6, 2023, the United States indicted four individuals on various drug possession and conspiracy charges:  Melvin Hodge, Carvin Cook, Sherman Thomas, and Frank Black.  (ECF No. 1.)  In a separate case, Quinton Parries was also charged in connection with this conspiracy.  *See United States v. Parries*, No. 1:23-cr-250 (filed May 3, 2023).  Mr. Parries has since pled guilty.

In this case, the indictment is based in part on data collected from Defendants' cell phones and evidence found in searches of Defendants' residences and places of business. The pending motions involve cell site information data turned over in response to a pen register application for Mr. Hodge's cell phone and two physical searches: a search of Mr. Hodge's residence at 804 Timberline Trail in Northfield, Ohio and a search of Mr. Hodge's place of business at 5450 Omega Avenue, Suite 4 in Bedford Heights, Ohio.

On August 22, 2022, the Magistrate Judge granted a pen register application under 18 U.S.C. §§ 3122 and 3123. (ECF No. 90-1, PageID #440–43.) On January 9, 2023, the Magistrate Judge signed an affidavit authorizing searches of the Timberline Trail residence in Northfield and the Omega Avenue business in Bedford Heights. (ECF No. 95-1, PageID #539.) The search warrants sought items like currency, books, records, bank statements, logbooks, papers related to purchasing and distributing controlled substances, travel-related records and tickets, photographs, firearms, personal identification, electronics, and storage media that could contain the records listed above. (ECF No. 110-1, PageID #843–44; ECF No. 110-2, PageID #851–52.)

On January 11, 2023, law enforcement conducted a search of the Timberline Trail residence in Northfield and seized five cell phones, three firearms, ammunition, and cash. (ECF No. 110-1, PageID #845–46.) On January 11, 2023, law enforcement conducted a search of the Omega Avenue business in Beford Heights and found a laptop, a USB thumb drive, an external electronic storage device, a plastic baggie

with white powder, an iPad, a DVR, and a hard drive tower.  (ECF No. 110-2, PageID #853–54.)

## FINDINGS OF FACT

Defendant's motion to suppress cell site location information alleges that the United States unlawfully obtained cell site location information through a pen register and trap device without a warrant as required under *Carpenter v. United States*, 585 U.S. 296 (2018).  Defendant alleges that the cell site location information helped support subsequent physical searches of his home and place of business.  Defendant's motion to suppress evidence obtained at the Timberline Trail residence in Northfield and the Omega Avenue business in Beford Heights challenges the information in the affidavit supporting each search warrant.

### A.    Cell Site Location Data

On August 22, 2022, the United States submitted an application pursuant to 18 U.S.C. §§ 3122 and 3123 to authorize the installation and use of a pen register and a trap-and-trace device to "record, decode, and capture dialing, routing, addressing, and signaling information associated with communications to or from" a target telephone number in the 602 area code.  (ECF No. 90-1, PageID #433.)  T-Mobile provided service for this number.  (*Id.*)  The applicant certified "that the information likely to be obtained by the requested pen/trap device is relevant to an ongoing criminal investigation being conducted by the Investigative Agency of possible violations of Title 21, U.S. Code, Sections 841 and 846 (distributing and possessing with the intent to distribute controlled substances and conspiring to distribute

3

controlled substances) by Carvin L. Cook, and others as yet unknown." (*Id.*, ¶ 5, PageID #434.)

The United States sought information regarding the date, time, and duration of communications involving the target phone. (*Id.*, ¶ 14, PageID #436–37.) Also, it sought, without geographic limit, source and destination phone numbers, source and destination email addresses, and any unique identifiers associated with the cell phone. (*Id.*) The United States did *not* request any cell site location information. On August 22, 2022, the Magistrate Judge approved and ordered the application. (ECF No. 90-1, PageID #440–43.) The pen register/trap device began on August 23, 2022 at 4:54 p.m. (ECF No. 90, PageID #427; ECF No. 114-1, PageID #902.) The last recorded entry on the pen record was on February 4, 2023 at 7:14 p.m. (ECF No. 114-1, PageID #891.)

In response to the order, T-Mobile provided not only the requested records but also cell site location information for some calls even though that information was not requested. (ECF No. 90, PageID #427; ECF No. 114-1, PageID #891–902 (pen register data which includes cell tower locations for select calls).) The United States used this cell site location information in an affidavit to support subsequent search warrants of Mr. Hodge's residence and place of business. (*See, e.g.*, ECF No. 95-1, ¶¶ 47, 55 & 149, PageID #514, #515 & #538; ECF No. 129-1, ¶¶ 47, 55 & 149, PageID #2550, #2551 & #2574.) Additionally, the United States requested ping data through a separate warrant that provided more comprehensive location information than the pen register—which Mr. Hodge does not challenge. (*See* ECF No. 114-3.)

4

### B.    The Searches at Issue

Based on the information presented to the Magistrate Judge in the master affidavit supporting the search warrants, the Court makes the following findings of fact for purposes of resolving the pending motions.  By way of background, Special Agent Stephen J. Chokshi of the Drug Enforcement Administration swore out the affidavit.  (ECF No. 95-1, PageID #496; ECF No. 129-1, PageID #2532.)  At that time, the affiant had thirteen years of experience as a special agent.  (ECF No. 95-1, ¶ 2, PageID #496; ECF No. 129-1, ¶ 2, PageID #2532.)

### B.1.    The Investigation

In July 2022, law enforcement learned of a UPS shipment containing 19 kilograms of multi-colored compression binder and a punch die in the shape of a clover addressed to Cleveland, Ohio.  (ECF No. 95-1, ¶¶ 14–17, PageID #504–05; ECF No. 129-1, ¶¶ 14–17, PageID #2540–41.)  On July 12, 2022, Defendant Carvin Cook picked up the package from a UPS facility in Highland Heights, Ohio.  (ECF No. 95-1, ¶ 15, PageID #504; ECF No. 129-1, ¶ 15, PageID #2540.)  Then, the Magistrate Judge authorized real-time precise location information and pen register trap devices for a phone number associated with Mr. Cook.  (ECF No. 95-1, ¶ 17, PageID #504; ECF No. 129-1, ¶ 17, PageID #2541.)

Through this process, officers were able to identify Defendant Sherman Thomas as a frequent contact of Mr. Cook's.  (ECF No. 95-1, ¶¶ 22–23, PageID #506–07; ECF No. 129-1, ¶¶ 22–23, PageID #2543–44.)  The Magistrate Judge authorized real time precise location information and a pen register and trap and trace device for Mr. Thomas's cell phone.  (ECF No. 95-1, ¶ 24, PageID #507; ECF

5

No. 129-1, ¶ 24, PageID #2543.)  This information led to the discovery that Mr. Thomas's cell phone number was listed on the UPS shipment containing the compression binder that Mr. Cook retrieved.  (ECF No. 95-1, ¶¶ 23 & 25, PageID #507; ECF No. 129-1, ¶¶ 23 & 25, PageID #2543.)

On September 16, 2022, the affiant received information regarding a shipment of 10 kilograms of caffeine and 21 kilograms of various colors of compression binder associated with one of Mr. Thomas's phone numbers.  (ECF No. 95-1, ¶ 28, PageID #508; ECF No. 129-1, ¶ 28, PageID #2544).  On September 20, 2022, investigators observed Mr. Thomas pick up the UPS package and transport it to a home on Reyburn Road in Cleveland.  (ECF No. 95-1, ¶ 29, PageID #508; ECF No. 129-1, ¶ 29, PageID #2544.)  Agents then observed Mr. Thomas travel between the Reyburn Road residence and his apartment on Father Caruso Drive.  (ECF No. 95-1, ¶ 29, PageID #508–09; ECF No. 129-1, ¶ 29, PageID #2544–45.)

On September 28, 2022, the Magistrate Judge signed search warrants for two residences tied to Mr. Thomas:  one on Father Caruso Drive and one on Reyburn Road, both in Cleveland, Ohio.  (ECF No. 95-1, ¶ 30, PageID #509; ECF No. 129-1, ¶ 30, PageID #2545.)  At the residence on Father Caruso Drive, officers executed the warrant and found methamphetamine, multicolored pills, a clover stamp, a firearm, a suspected narcotics ledger, and several cell phones.  (ECF No. 95-1, ¶¶ 31–32, PageID #509–10; ECF No. 129-1, ¶¶ 31–32, PageID #2545–46.)  At the Reyburn Road residence, officers seized a pill press, a rifle, compression binder, blenders containing white residue, and other drug paraphernalia.  (ECF No. 95-1, ¶ 33, PageID #510; ECF

No. 129-1, ¶ 33, PageID #2546.)  On October 4, 2022, the Magistrate Judge authorized a search warrant for the cell phones found at the residence on Father Caruso Drive. (ECF No. 95-1, ¶ 34, PageID #510; ECF No. 129-1, ¶ 34, PageID #2546.)

### B.2.    Identification of Mr. Hodge as a Suspect

Based on the search of Mr. Thomas's phones, the affiant was able to identify the target phone with the 602 area code as a common caller to several phones that Mr. Thomas used.  (ECF No. 95-1, ¶ 35, PageID #511; ECF No. 129-1, ¶ 35, PageID #2547.)  A query through the Ohio prison system call center indicated that the number belonged to someone identified as "Melvin."  (ECF No. 95-1, ¶ 36, PageID #511; ECF No. 129-1, ¶ 36, PageID #2547.)  On August 22, 2022, the Magistrate Judge authorized the installation of a pen register and trap and trace device for the target number.  (ECF No. 95-1, ¶ 37, PageID #511; ECF No. 129-1, ¶ 37, PageID #2547.)  A review of the phone and WhatsApp records revealed that the number was in frequent contact with a Mexican phone number (ECF No. 95-1, ¶ 38, PageID #512; ECF No. 129-1, ¶ 38, PageID #2548), which law enforcement suspected was tied to illegal drugs (ECF No. 95-1, ¶ 38, PageID #512; ECF No. 129-1, ¶ 38, PageID #2548). Records from Charter Communications showed that the target number was connected to a unique identifier located at 804 Timberline Trail in Northfield, Ohio. (ECF No. 95-1, ¶ 40, PageID #512; ECF No. 129-1, ¶ 40, PageID #2548.)  The Timberline Trail residence is a "two-story residence with multicolored beige stone and beige siding."  (ECF No. 110-1, PageID #842.)

On August 24, 2022, an investigator drove past the Timberline Trail residence and performed a registration search of a silver Ford Escape parked in the driveway.

(ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)  The affiant denoted the Timberline Trail residence as "Target Location 1." (ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)  A search of the vehicle's registration showed that it was registered to Bratenahl Mobile Kitchen, LLC on Walvern Boulevard in Maple Heights, Ohio.  (ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)  The Ohio Secretary of State website indicated that this company was owned by "Melvin E. Hodge III." (ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)  Mr. Hodge has an Ohio driver's license with an address listed at the same residence on Walvern Boulevard.  (ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)

Based on the affiant's review of these records and others later obtained from Apple, he determined that the target number belonged to Mr. Hodge. (ECF No. 95-1, ¶¶ 40–42, PageID #512–13; ECF No. 129-1, ¶¶ 40–42, PageID #2548–49.) Additionally, a search of airline records associated Mr. Hodge with another telephone number in the 216 area code.  (ECF No. 95-1, ¶ 43, PageID #513; ECF No. 129-1, ¶ 43, PageID #2549.)

### B.3.   Surveillance

### B.3.a. Surveillance of Mr. Thomas and Mr. Hodge

On September 18, 2022, around 11:11 p.m., "a series of 3 contacts occurred between" one of Mr. Thomas's phones and the target number belonging to Mr. Hodge. (ECF No. 95-1, ¶ 44, PageID #513; ECF No. 129-1, ¶ 44, PageID #2549.)  Shortly after midnight on September 19, 2022, a GPS tracking device on Mr. Thomas's vehicle revealed that he was near Rockside Road and Aurora Road in Bedford Heights, Ohio.

(ECF No. 95-1, ¶ 45, PageID #513; ECF No. 129-1, ¶ 45, PageID #2549.)  The GPS tracking device showed that Mr. Thomas returned to his residence on Father Caruso Drive later that evening.  (ECF No. 95-1, ¶ 45, PageID #513; ECF No. 129-1, ¶ 45, PageID #2549.)

That morning, between 10:00 a.m. and 1:00 p.m., one of Mr. Thomas's phones was in contact with Mr. Hodge's target number approximately 21 times.  (ECF No. 95-1, ¶ 46, PageID #513; ECF No. 129-1, ¶ 46, PageID #2549.)  During this time, cell site location information for Mr. Hodge's target number showed that the phone was near 5450 Omega Avenue, Suite 4 in Bedford Heights, Ohio.  (ECF No. 95-1, ¶ 47, PageID #514; ECF No. 129-1, ¶ 47, PageID #2550.)  At approximately 1:30 p.m., Mr. Hodge's target number called Mr. Thomas twice.  (ECF No. 95-1, ¶ 48, PageID #514; ECF No. 129-1, ¶ 48, PageID #2550.)  At 1:33 p.m., GPS tracking on Mr. Thomas's car showed that he stopped at a restaurant named A Touch of Italy on Aurora Road in Bedford Heights.  (ECF No. 95-1, ¶ 49, PageID #514; ECF No. 129-1, ¶ 49, PageID #2550.)  At 1:35 p.m., Mr. Thomas called Mr. Hodge's target number while Mr. Thomas was in the parking lot at A Touch of Italy.  (ECF No. 95-1, ¶ 50, PageID #514; ECF No. 129-1, ¶ 50, PageID #2550.)

Five minutes later, investigators observed Mr. Thomas's vehicle parked next to the Ford Escape registered to Mr. Hodge's Bratenahl Mobile Kitchen business.  (ECF No. 95-1, ¶ 51, PageID #514; ECF No. 129-1, ¶ 51, PageID #2550.)  Then, they saw Mr. Thomas talking on his phone near the rear passenger door of the Ford Escape.  (ECF No. 95-1, ¶ 52, PageID #514; ECF No. 129-1, ¶ 52, PageID #2550.)

9

Mr. Thomas entered "the rear passenger door of [Mr. Hodge]'s grey Ford Escape. [Mr. Thomas] then went into the driver's side door" with two cellphones to his ears at the same time.  (ECF No. 95-1, ¶ 52, PageID #514; ECF No. 129-1, ¶ 52, PageID #2550.)  Around this time, Mr. Hodge's target number received a call from Mr. Thomas.  (ECF No. 95-1, ¶ 52, PageID #514; ECF No. 129-1, ¶ 52, PageID #2550.) Mr. Thomas again entered the Ford Escape through the rear passenger door and stayed inside the vehicle for a few minutes.  (ECF No. 95-1, ¶ 53, PageID #514–15; ECF No. 129-1, ¶ 53, PageID #2550–51.)  Then, Mr. Thomas exited the Ford Escape and drove away in his car to his residence on Father Caruso Drive.  (ECF No. 95-1, ¶¶ 53 & 56, PageID #515; ECF No. 129-1, ¶ 53 & 56, PageID #2551.)

At 2:14 p.m., an investigator observed Mr. Hodge (identified through his driver's license photo) exit A Touch of Italy while talking on a cell phone.  (ECF No. 95-1, ¶ 54, PageID #515; ECF No. 129-1, ¶ 54, PageID #2551.)  Then, he looked in the rear passenger area of the Ford Escape, where Mr. Thomas had been earlier. (ECF No. 95-1, ¶ 54, PageID #515; ECF No. 129-1, ¶ 54, PageID #2551.)  Minutes later, Mr. Hodge hung up the phone and went back into the restaurant.  (ECF No. 95-1, ¶ 57, PageID #515; ECF No. 129-1, ¶ 57, PageID #2551.)  An hour later, Mr. Hodge exited the restaurant and drove away, making a series of stops, until returning to the Timberline Trail residence at 4:50 p.m.  (ECF No. 95-1, ¶¶ 58–62, PageID #515–16; ECF No. 129-1, ¶¶ 58–62, PageID #2551–52.)

Based on this information, the affiant believed that Mr. Thomas met with Mr. Hodge "during the early morning hours of September 19, 2022 to acquire crystal

methamphetamine from [Mr. Hodge] in order to press methamphetamine pills which were subsequently seized by investigators on September 28, 2022 at [Mr. Thomas's] residence." (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552.) Additionally, the affiant concluded that the September 19, 2022 interaction between Mr. Thomas and Mr. Hodge occurred so that Mr. Thomas could "place narcotics proceeds into a hidden compartment or 'trap' in [Mr. Hodge's] vehicle for the crystal methamphetamine [Mr. Hodge] provided to [Mr. Thomas] earlier in the day." (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552.) The affiant inferred that Mr. Hodge then "took the narcotics proceeds" he received from Mr. Thomas to the Timberline Trail residence. (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552.) As previously noted, Mr. Thomas picked up a UPS shipment of kilogram quantities of pill compression binder and caffeine the next day. (ECF No. 95-1, ¶¶ 28–29, PageID #508–09; ECF No. 129-1, ¶¶ 28–29, PageID #2544–45.) This meet-up occurred nine days before law enforcement searched Mr. Thomas's residences. (ECF No. 95-1, ¶¶ 30–33, PageID #509–10; ECF No. 129-1, ¶¶ 30–33, PageID #2545–46.)

During a subsequent review of the search warrant results of one of Mr. Thomas's phones, the affiant located a "chat" between Mr. Thomas and Mr. Hodge's target number that occurred on November 19, 2021. (ECF No. 95-1, ¶ 65, PageID #517–18; ECF No. 129-1, ¶ 65, PageID #2553–54.) Although nothing in the text exchange explicitly mentions narcotics, the affiant concluded that Mr. Thomas and Mr. Hodge were discussing a drug transaction surreptitiously. (ECF No. 95-1,

¶ 65, PageID #518; ECF No. 129-1, ¶ 65, PageID #2554.)  Specifically, the affiant believed that Mr. Hodge was supplying illicit narcotics to Mr. Thomas and that they frequently used A Touch of Italy as an exchange point.  (ECF No. 95-1, ¶ 65, PageID #518; ECF No. 129-1, ¶ 65, PageID #2554.)

The affiant found another chat between Mr. Thomas and Mr. Hodge occurring on September 21, 2022 in which Mr. Thomas requests a FaceTime call with Mr. Hodge.  (ECF No. 95-1, ¶ 66, PageID #518; ECF No. 129-1, ¶ 66, PageID #2254.)  On September 27, 2022, Mr. Thomas's internet search history revealed that he searched for the size of an "m 30 pill."  (ECF No. 95-1, ¶ 66, PageID #519; ECF No. 129-1, ¶ 66, PageID #2555.)  The pill press seized from Mr. Thomas's residence on Reyburn Road contained stamps for 30 mg oxycodone pills.  (ECF No. 95-1, ¶ 66, PageID #519; ECF No. 129-1, ¶ 66, PageID #2555.)  Based on his training and experience, the affiant concluded that Mr. Thomas, at Mr. Hodge's suggestion, "wanted to discuss purchasing powder fentanyl in order to press counterfeit 30 mg Oxycodone pills."  (ECF No. 95-1, ¶ 66, PageID #519; ECF No. 129-1, ¶ 66, PageID #2555.)

### B.3.b. Surveillance of Mr. Hodge's Residence and Business

Between October and November 2022, law enforcement surveilled Mr. Hodge and gathered information to support connections between the Timberline Trail residence and a commercial property located at 5450 Omega Avenue, Suite 4 in Bedford Heights, Ohio to an ongoing drug conspiracy.  (ECF No. 95-1, ¶¶ 67–111, PageID #519–29; ECF No. 129-1, ¶ 67–111, PageID #2555–65.)

### B.3.b.i. Place of Business

5450 Omega Avenue is a "multi-unit business park with the exterior of the building consisting of brown brick." (ECF No. 110-2, PageID #850.)  Mr. Hodge's unit is visible from the street and included a "brown garage door to the left of a tinted glass door."  (*Id.*)  From the photo of the unit on the warrant, the Omega Avenue Business appears to be some type of garage storage facility.  (*Id.*)

Investigators found that a company called Bounce Mountain LLC, registered to an individual named Edward Mahone, occupied the Omega Avenue business.  (ECF No. 95-1, ¶ 70, PageID #520; ECF No. 129-1, ¶ 70, PageID #2556.)  When investigators called the phone number for Bounce Mountain LLC, they reached "an automated voice system" of a "reservations department for a hotel."  (ECF No. 95-1, ¶ 70, PageID #520; ECF No. 129-1, ¶ 70, PageID #2556.)  The City of Bedford Heights building department confirmed that the Omega Avenue business was registered to Bounce Mountain LLC, with the last inspection occurring in January 2013.  (ECF No. 95-1, ¶ 70, PageID #520; ECF No. 129-1, ¶ 70, PageID #2556.)

### B.3.b.ii. Residence

On October 5, 2022, investigators surveilled Mr. Hodge near the Timberline Trail residence, and at 12:58 p.m. watched him drive the Ford Escape to the Omega Avenue business.  (ECF No. 95-1, ¶¶ 67–71, PageID #519–21; ECF No. 129-1, ¶¶ 67–71, PageID #2555–57.)  Later in the afternoon, Mr. Hodge (identified by his driver's license picture) approached an undercover agent parked near the business and asked if the agent was a police officer because he had observed the agent follow him.  (ECF No. 95-1, ¶ 71, PageID #520–21; ECF No. 129-1, ¶ 71, PageID #2556–57.)

13

In response, the agent advised Mr. Hodge that he was there waiting for someone at another business.  (*Id.*)  At 3:02 p.m., Mr. Hodge and an individual driving a black Porsche departed the Omega Avenue business and drove to A Touch of Italy.  (ECF No. 95-1, ¶¶ 72–73, PageID #521; ECF No. 129-1, ¶¶ 72–73, PageID #2557.)

### B.4.  The Warrants and Resulting Information

On October 20, 2022, the Magistrate Judge authorized a search warrant for officers to obtain "precise location data, prospective cellular data and installation of a pen register trap and trace device" on the target number and another of Mr. Hodge's phone numbers. (ECF No. 95-1, ¶ 76, PageID #522; ECF No. 129-1, ¶ 76, PageID #2558.)  That same day, the Magistrate Judge authorized a tracking warrant for Mr. Hodge's Ford Escape.  (ECF No. 95-1, ¶ 77, PageID #522; ECF No. 129-1, ¶ 77, PageID #2558.)

Two days later, agents received ping locations for both of Mr. Hodge's phones while he was at the Timberline Trail residence.  (ECF No. 95-1, ¶ 78, PageID #522; ECF No. 129-1, ¶ 78, PageID #2558.)  A few days later, investigators established surveillance and saw a Ford Ranger parked in the home's assigned visitor parking spot.  (ECF No. 95-1, ¶¶ 79–80, PageID #522–23; ECF No. 129-1, ¶¶ 79–80, PageID #2558–59.)  The Ford Ranger is registered to Around Your Way LLC.  (ECF No. 95-1, ¶ 80, PageID #522–23; ECF No. 129-1, ¶ 80, PageID #2558–59.)  Mr. Hodge has a business registered in Ohio called Around Your Way Towing and Transport LLC. (ECF No. 95-1, ¶ 80, PageID #522–23; ECF No. 129-1, ¶ 80, PageID #2558–59.)  At 11:49 a.m., investigators watched Mr. Hodge pull the Ford Escape out of the garage

at the Timberline Trail residence.  (ECF No. 95-1, ¶ 81, PageID #523; ECF No. 129-1, ¶ 81, PageID #2559.)

On October 25, 2022, DEA conducted a $250,000 undercover money pick-up operation of narcotics proceeds with an individual not named in this indictment. (ECF No. 95-1, ¶ 95, PageID #526; ECF No. 129-1, ¶ 95, PageID #2562.)  This individual drives a black Land Rover.  (ECF No. 95-1, ¶ 94, PageID #525; ECF No. 129-1, ¶ 94, PageID #2561.)  Pen register information, open-source records, and "corroboration through historical investigative information" showed that a phone number used by this individual had seven contacts with one of Mr. Hodge's phones on October 25, 2022.  (ECF No. 95-1, ¶ 95, PageID #526; ECF No. 129-1, ¶ 95, PageID #2562.)  That same day, ping notifications for Mr. Hodge's phone numbers, the GPS tracking on the Ford Escape, and investigator surveillance placed him at the Omega Avenue business.  (ECF No. 95-1, ¶¶ 96–98, PageID #526; ECF No. 129-1, ¶¶ 96–98, PageID #2562.)

On October 28, 2022, investigators installed a GPS tracking device on Mr. Hodge's Ford Escape.  (ECF No. 95-1, ¶ 84, PageID #523; ECF No. 129-1, ¶ 84, PageID #2559.)  On November 7, 2022, agents located Mr. Hodge in a shopping plaza in Beachwood, Ohio, which he departed followed by a black Porsche.  (ECF No. 95-1, ¶¶ 85–86, PageID #523–24; ECF No. 129-1, ¶¶ 85–88, PageID #2559–60.)  Mr. Hodge then drove westbound on a highway in his Ford Escape.  (ECF No. 95-1, ¶¶ 87–88, PageID #524; ECF No. 129-1, ¶¶ 87–88, PageID #2560.)  A few moments after Mr. Hodge's vehicle left East 74th Street, an agent saw a "dark colored Land Rover

circling the area" with a partial license plate of JTD1 near where the Ford Escape was located.  (ECF No. 95-1, ¶ 88, PageID #524; ECF No. 129-1, ¶ 88, PageID #2560.) The affiant believed that Mr. Hodge took a "longer route in order to determine if anyone was following him" by exiting the highway and getting back on, which was consistent with Mr. Hodge "conduct[ing] countersurveillance."  (ECF No. 95-1, ¶ 89, PageID #524; ECF No. 129-1, ¶ 89, PageID #2560.)

Later that day, agents observed Mr. Hodge meet up with an older man driving a minivan near a restaurant in Bedford.  (ECF No. 95-1, ¶¶ 90–91, PageID #525; ECF No. 129-1, ¶¶ 90–91, PageID #2561.)  The affiant noted that this older man had a prior federal drug conviction.  (ECF No. 95-1, ¶¶ 91–92, PageID #525; ECF No. 129-1, ¶¶ 91–92, PageID #2561.)

After discovering this information, investigators surveilled Mr. Hodge at the Omega Avenue business.  (ECF No. 95-1, ¶ 99, PageID #526–27; ECF No. 129-1, ¶ 99, PageID #2562–63.)   There, investigators observed Mr. Hodge meet with the individual driving the black Porsche that investigators had seen following Mr. Hodge twice before.  (ECF No. 95-1, ¶¶ 99–100, PageID #526–27; ECF No. 129-1, ¶¶ 99–100, PageID #2562–63.)  The investigator observed Mr. Hodge and the driver of the black Porsche converse, then watched Mr. Hodge reach into the Ford Escape and remove a small green-and-black satchel.  (ECF No. 95-1, ¶¶ 101–02, PageID #527; ECF No. 129-1, ¶¶ 101–02, PageID #2563.)  The driver of the Black Porsche removed a "manila colored envelope" from the driver's side door of his car.  (ECF No. 95-1, ¶ 103, PageID #528; ECF No. 129-1, ¶ 103, PageID #2564.)  Both men entered Mr. Hodge's

16

Ford Ranger and departed from the Omega Avenue business. (ECF No. 95-1, ¶¶ 104–07, PageID #524; ECF No. 129-1, ¶¶ 104–07, PageID #2564.)

From November 11, 2022 to November 24, 2022, tracking information on Mr. Hodge's Ford Escape showed that he placed it inside a garage at the Omega Avenue business and that he did not drive it regularly. (ECF No. 95-1, ¶ 108, PageID #528–29; ECF No. 129-1, ¶ 108, PageID #2564–65.) On November 25, 2022, GPS tracking information showed the Ford Escape moving away from the Omega Avenue business, but based on its movements and further surveillance "it did not appear that [Mr. Hodge] was operating" the vehicle. (ECF No. 95-1, ¶¶ 109–10, PageID #529; ECF No. 129-1, ¶¶ 109–10, PageID #2565.) The affiant believed, based on his training and experience, that Mr. Hodge detected law enforcement and "stopped utilizing" the Ford Escape "in order to thwart further surveillance efforts." (ECF No. 95-1, ¶ 111, PageID #529; ECF No. 129-1, ¶ 111, PageID #2565.)

## C.  FedEx Package Drop-Off

On November 23, 2022, the affiant learned of a FedEx package addressed to a third party on Tremaine Drive in Euclid, Ohio, containing two kilograms of pill binder, set for delivery on December 1, 2022. (ECF No. 95-1, ¶ 113, PageID #530; ECF No. 129-1, ¶ 113, PageID #2566.) In response to an administrative subpoena, the supplier produced the purchase history of this third party, which included previous orders of pill binder delivered to various addresses in Cleveland and Euclid. (ECF No. 95-1, ¶ 114, PageID #530; ECF No. 129-1, ¶ 114, PageID #2566.) On December 1, 2022, the affiant set up surveillance near the Tremaine Drive address and observed a white van with two passengers parked in front of the building. (ECF

No. 95-1, ¶ 116, PageID #530–31; ECF No. 129-1, ¶ 116, PageID #2566–67.)  At 12:26 p.m., a male exited the van, entered the building, and less than one minute later exited the building and departed westbound.  (ECF No. 95-1, ¶ 116, PageID #530–31; ECF No. 129-1, ¶ 116, PageID #2566–67.)  At 2:03 p.m., the affiant observed the white van drive back and forth in front of the building and make other stops at businesses nearby before ultimately returning to the building on Tremaine Drive.   (ECF No. 95-1, ¶¶ 118–22, PageID #531–32; ECF No. 129-1, ¶¶ 118–22, PageID #2567–68.)  At 3:34 p.m., a FedEx truck turned onto Tremaine Drive, and the driver of the van exited the vehicle and met the FedEx driver in front of the Tremaine Drive building.  (ECF No. 95-1, ¶ 124, PageID #532; ECF No. 129-1, ¶ 124, PageID #2568.)  The FedEx driver handed the van driver a brown box matching the description of the pill binder shipment.  (ECF No. 95-1, ¶ 124, PageID #532; ECF No. 129-1, ¶ 124, PageID #2568.)  FedEx tracking indicated that the package was delivered at 3:36 p.m.  (ECF No. 95-1, ¶ 124, PageID #532; ECF No. 129-1, ¶ 124, PageID #2568.)

At 3:50 p.m., an investigator observed the van arrive at a restaurant called Bratenahl Kitchen located in Cleveland.  (ECF No. 95-1, ¶ 125, PageID #532; ECF No. 129-1, ¶ 125, PageID #2568.)  This business is registered to Mr. Hodge.  (ECF No. 95-1, ¶ 126, PageID #532; ECF No. 129-1, ¶ 126, PageID #2568.)  After the van's driver entered and exited the restaurant, both occupants of the van conversed with others in the parking lot, then the white van departed Bratenhal Kitchen and headed toward a residence on Locke Avenue in Cleveland.  (ECF No. 95-1, ¶¶ 127–28, PageID #533; ECF No. 129-1, ¶¶ 127–28, PageID #2569.)   Upon arriving, one of the

18

passengers carried the FedEx package inside the house. (ECF No. 95-1, ¶ 128, PageID #533; ECF No. 129-1, ¶ 128, PageID #2569.) Ping data for one of Mr. Hodge's cell numbers placed that phone near Bratenahl Kitchen from 2:53 p.m. to 3:13 p.m. (ECF No. 95-1, ¶ 126, PageID #532; ECF No. 129-1, ¶ 126, PageID #2568.) Investigators identified one of the two males in the van as having a criminal drug history. (ECF No. 95-1, ¶¶ 132–33, PageID #534; ECF No. 129-1, ¶¶ 132–33, PageID #2570.)

### D.    Additional Information

On December 5, 2022, investigators removed the GPS tracking device on Mr. Hodge's Ford Escape while it was parked at the Omega Avenue business. (ECF No. 95-1, ¶ 135, PageID #534; ECF No. 129-1, ¶ 135, PageID #2570.) Continued surveillance of Mr. Hodge in December 2022 demonstrated his frequency at the Timberline Trail residence, the Omega Avenue business, and A Touch of Italy—corroborated by ping location data. (ECF No. 95-1, ¶¶ 134–42, PageID #534–35; ECF No. 129-1, ¶¶ 134–42, PageID #2570–71.) During this time, Mr. Hodge appeared to drive his Ford Escape frequently to and from the Timberline Trail residence and the Omega Avenue business. (ECF No. 95-1, ¶¶ 134–42, PageID #534–35; ECF No. 129-1, ¶¶ 134–42, PageID #2570–71.) As noted, the affiant believed that Mr. Hodge discovered the GPS tracker on the Ford Escape after the surveillance on November 10, 2022 and stopped using the vehicle until he determined that the GPS tracker had been removed. (ECF No. 95-1, ¶ 143, PageID #535; ECF No. 129-1, ¶ 143, PageID #2571.)

The affiant believed that the Timberline Trail residence was Mr. Hodge's primary residence and that the Omega Avenue business was a second location where Mr. Hodge conducted an "illicit narcotics business." (ECF No. 95-1, ¶ 147, PageID #537; ECF No. 129-1, ¶ 147, PageID #2573.)  The affidavit contains a list of five limited liability companies registered to Mr. Hodge—none of which is registered at the Timberline Trail residence or the Omega Avenue business addresses.  (ECF No. 95-1, ¶¶ 145 & 147, PageID #536 & 537; ECF No. 129-1, ¶¶ 145 & 147, PageID #2572–73.) The affiant believed that Mr. Hodge went to great lengths to conceal both locations from law enforcement.  (ECF No. 95-1, ¶¶ 147–48, PageID #537–38; ECF No. 129-1, ¶¶ 147–48, PageID #2573–74.)  Additionally, he believed that Mr. Hodge used both locations to keep "narcotics proceeds, cellular telephones, drug ledgers, financial records for [his] LLCs, flight and travel records and other evidence of narcotics violations."  (ECF No. 95-1, ¶ 151, PageID #539; ECF No. 129-1, ¶¶ 151, PageID #2575.)

## GOVERNING LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Kyllo v. United States*, 533 U.S. 27, 31

(2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"  *Payton v. New York,* 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).

"To establish probable cause adequate to justify issuance of a search warrant, the governmental entity or agent seeking the warrant must submit to the magistrate an affidavit that establishes 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).

Probable cause is "not a high bar."  *Kaley v. United States*, 571 U.S. 320, 338 (2014).  It means "reasonable grounds for belief, supported by less than prima facie proof, but more than mere suspicion."  *United States v. Lattner,* 385 F.3d 947, 951 (6th Cir. 2004) (cleaned up); *see also United States v. Padro*, 52 F.3d 120, 122–23 (6th Cir. 1995) (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  Ultimately, the determination of probable cause involves a practical, commonsense review of the totality of the available facts and circumstances.  *Padro*, 52 F.3d at 123 (citations omitted).

## CONCLUSIONS OF LAW

Ordinarily, a court affords a magistrate judge's determination of probable cause "great deference."  *United States v. Asker*, 676 F. App'x 447, 456 (6th Cir. 2017) (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)); *see also United States v. Abernathy*, 843 F.3d 243, 250 (6th Cir. 2016) ((quoting *United States v. Allen*, 211

F.3d 970, 973 (6th Cir. 2000) (en banc)). A reviewing court does not scrutinize the issuance of a warrant after the fact under a *de novo* standard, which would be inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to warrants. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quotation omitted). The issuing judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. When reviewing that determination, the court simply ensures that the magistrate judge had a substantial basis for concluding that probable cause supported the warrant. *Id.* at 238–39; *see also United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)).

"Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). In addition to the facts in the affidavit, a reviewing court also considers reasonable inferences from those facts. *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018). In determining whether probable cause supports issuance of a warrant, a court reviews the significance of each piece of evidence on which the affidavit relies, then considers the totality of facts and circumstances. *United States v. Christian*, 893 F.3d 846, 854 (6th Cir. 2018). But a court does not engage in line-by-line scrutiny of the affidavit. *United States v. Walling*, 747 F. App'x

382, 385 (6th Cir. 2018) (quoting *United States v. Allen*, 211 F.3d 970, 972–73 (6th Cir. 2000) (en banc)).  In conducting its analysis, a court focuses on the factual assertions in the affidavit supporting the warrant, not conclusory statements from the affiant.  *Christian*, 893 F.3d at 859 (citing *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)).  The responsibility for determining whether probable cause supports a warrant rests with the issuing judge, not the officer seeking the warrant. *McCoy*, 905 F.3d at 416 (citing *Leon*, 468 U.S. at 919–22).

## I.     Motion to Suppress Cell Site Location Data (ECF No. 90)

Defendant does not object to the Magistrate Judge's grant of the order permitting the installation of the trap device and pen register.  Nor does he dispute the scope of the information captured by the pen register.  Instead, Defendant argues that "law enforcement unlawfully obtained cell site/location data from T-Mobile telephone number (602) [XXX–XXXX] through its pen register/trap and trace device Order, without a warrant and affidavit supported by probable cause."  (ECF No. 90, PageID #430.)  Defendant relies on *Carpenter v. United States*, 585 U.S. 296 (2018), for the proposition that, if the United States wishes to obtain cell site location information, it must generally do so with a warrant supported by probable cause. And because there was no warrant in this case, the Court should suppress the cell site information as well as evidence obtained from subsequent searches reliant on the location information as "fruits of the poisonous tree."  (ECF No. 90, PageID #431.)

The United States responds by arguing that (1) the Stored Communications Act, 18 U.S.C. § 2701, does not provide for suppression as a remedy; and (2) even if it

did, *Carpenter* does not control T-Mobile's voluntary disclosure of limited cell site data.  (ECF No. 111, PageID #862–63.)

## I.A.    Stored Communications Act

The exclusionary rule is not a remedy available for statutory violations unless the Constitution requires it or a statute expressly provides for it.  *United States v. Ware*, 161 F.3d 414, 424–25 (6th Cir. 1998).  Neither the Stored Communications Act (which governs the acquisition of stored electronic communications, including cell phone records) nor the pen register statute provide for the suppression of evidence as a remedy for non-constitutional violations of these statutes.  *See* 18 U.S.C. § 2708 (Stored Communications Act); *United States v. Powell*, 847 F.3d 760, 771 (6th Cir. 2017) (citing *United States v. Thompson*, 936 F.3d 1249, 1250–51 (11th Cir. 1991)) (pen register statute).  Therefore, to the extent that Mr. Hodge argues that the United States violated either statute in acquiring the cell site location data, suppression is not available as a remedy.

## I.B.    Application of *Carpenter*

Defendant's constitutional arguments merit a separate discussion.  *See United States v. Gasperini*, 894 F.3d 482, 488 (2d Cir. 2018)*; United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014).  Generally, as Defendant points out, the United States needs a search warrant to obtain historical cell site information.  *Carpenter*, 585 U.S. at 316–17.  In *Carpenter*, the United States obtained cell site location data for a particular phone number that allowed it to track the historical location of that phone over a four-month period, resulting in nearly 13,000 location points—an average of 101 data points per day.  *Id.* at 302.  This data amounted to a search under the Fourth

24

Amendment because it provided an "all-encompassing record" of the user's whereabouts—"revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311. (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). In this case, the information at issue does not sweep so far.

Information obtained pursuant to 18 U.S.C. §§ 3122 and 3123 is not a "search" under the Fourth Amendment and, therefore, not subject to its warrant requirements. *Smith v. Maryland*, 442 U.S. 735, 745–46 (1979). And the Supreme Court has "held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by [it] to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed." *United States v. Jacobsen*, 466 U.S. 109, 115 (1984) (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)). Indeed, the Fourth Amendment is not implicated where the United States did not engage in misconduct or unlawfully exceed the scope of the search warrant in obtaining protected information. *Id.* at 113–14 & 117–18.

Here, Mr. Hodge's cell phone provider, a private third party, disclosed the cell site information without the authorities making a request for it. The United States acquired Mr. Hodge's cell site location data incidentally, as part of the provider's response to a valid pen register application. The United States might not have been entitled to *request* the cell site location data without a warrant. But there is no suggestion that the provider produced this information as part of an informal

arrangement with the United States or in an effort to curry favor with regulators or others before whom it might have business. Nor does the record show that this production is part of a pattern and practice for obtaining such information or support an inference of misconduct on the part of investigators. Accordingly, the Court concludes that the incidental acquisition of cell site information in this case did not violate Mr. Hodge's Fourth Amendment rights.

In any event, *Carpenter's* holding was narrow, "decid[ing] no more than the case before it," and not "address[ing] other business records that might incidentally reveal location information." 568 U.S. at 316 & n.4. That limitation applies here, where lawfully obtained pen register data incidentally revealed cell site location information. Moreover, the cell site information obtained through the pen register was limited—it was not an encyclopedic database of all of Mr. Hodge's movements for the sixty-day period. *Carpenter*, 568 U.S. at 309. In contrast, the ping warrant data, which Mr. Hodge does not challenge, "includes precise latitude, longitude, and information that allows agents to interpret the triangulation of cell tower location, which in turn provides law enforcement a proximate meter radius." (ECF No. 111, PageID #866; ECF No. 114-3.)

## I.C.   Evidentiary Hearing

In the alternative to suppressing the evidence, Defendant requests that the Court hold an evidentiary hearing "to determine how law enforcement unlawfully obtained the cell site location data at issue in this case without a warrant." (ECF No. 90, PageID #431.) The United States does not respond to this request.

"A district court is required to hold an evidentiary hearing when the defendant has set forth contested issues of fact that bear on the legality of a search." *United States v. Montgomery*, 395 F. App'x 177, 186 (6th Cir. 2010).  To justify a request for an evidentiary hearing, a defendant must set forth "sufficiently definite, specific, detailed, and non-conjectural" reasons that enable the court to conclude that contested factual issues cast doubt on a search's validity.  *United States v. Moore*, 999 F.3d 993, 999 (6th Cir. 2021) (citing *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006)).  Defendant does not specify any contested issues of fact related to the question of the cell site location information.  He does not contest that the United States lawfully requested the pen register data and that his cell phone provider disclosed the cell site information without a request for it from the United States.  Any argument that a hearing might discover evidence bearing on the legality of the search rests on speculation at this point.  For these reasons, no evidentiary hearing is necessary, and the Court declines to hold one.

## II.  Motion to Suppress Searches of the Timberline Trail Residence and the Omega Avenue Business (ECF No. 92)

Defendant argues that the searches of the Timberline Trail residence and the Omega Avenue business violated the Fourth Amendment because the warrant does not establish probable cause.  (ECF No. 92.)  Specifically, he argues that the search warrant failed to establish probable cause for three reasons:  (1) the affidavit included false or misleading information; (2) there was no nexus between any alleged criminal conduct and the residence and business to be searched; and (3) the affidavit relied on

stale information.   Accordingly, he seeks to suppress the evidence resulting from those searches.

The exclusionary rule requires suppression of evidence seized from a search that violates the Fourth Amendment.  *Weeks v. United States*, 232 U.S. 383, 394 (1914).  That "judge-made remedy," however, "does not extend . . . to all Fourth Amendment violations."  *United States v. Robinson*, 63 F.4th 530, 534 (6th Cir. 2023) (citing *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006)).   For example, where officers rely in good faith on a warrant to conduct a search, exclusion of evidence is not the appropriate remedy even if a court later determines that probable cause was absent.  *Leon¸* 468 U.S. at 913.

For its part, the United States argues that the affidavit established probable cause to search both locations and that Defendant does not carry his "heavy burden" for obtaining a *Franks* hearing.  (ECF No. 110.)  Further, the United States maintains that officers relied on the warrant in good faith.  (*Id.*)

### II.A.   Reasonable Expectation of Privacy in the Business

In its brief, the United States argues that Defendant failed to demonstrate that he had a legitimate expectation of privacy in the Omega Avenue business and that he therefore lacks standing to challenge the search conducted at that location.  (ECF No. 110, PageID #802.)  At oral argument, however, the United States conceded that Mr. Hodge did have a legitimate expectation of privacy there and withdrew its argument regarding standing.  (ECF No. 133, PageID #2671–72.)  The Court agrees and needs not address the issue further.

## II.B.  Probable Cause

To show that probable cause supported the issuance of a warrant, the affidavit must contain particularized facts demonstrating a "fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPherson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Weaver*, 99 F.3d 1372, 1376 (6th Cir.1996)).  Defendant challenges the Magistrate Judge's finding of probable cause on three grounds:  (1) that there was an insufficient nexus between alleged criminal conduct and the places searched; (2) that the affiant relied on stale information; and (3) that the affidavit contained false or misleading information.

### II.B.1. Nexus Requirement

Defendant argues that the affidavit "lacked probable cause" to search the Timberline Trail residence and the Omega Avenue business because there was neither direct evidence that Melvin Hodge had any involvement with criminal activity nor any allegation "in the four corners of the affidavit show[ing] a fair probability that narcotics would be found at either [location]."  (ECF No. 92, PageID #476–77.)  The United States responds that the search warrants at issue were not directed at seizing drugs; rather, the types of evidence sought by those warrants were other items "likely to be found in a defendant's residence or business."  (ECF No. 110, PageID #814.)  In any event, the Magistrate Judge had a "substantial basis" to find probable cause because of the nexus between the two locations and the items to be seized.  (*Id.*, PageID #810.)

As to Defendant's first argument, a finding of probable cause does not require direct evidence.  An affiant need not "rule out a suspect's innocent explanation for

suspicious facts." *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018).  Instead, a correct evaluation of probable cause assesses "the degree of suspicion that attaches to particular types of non-criminal acts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018).  Although the affidavit does not offer direct evidence of drug activity occurring at either the Timberline Trail residence or the Omega Avenue business, it does contain many instances connecting both locations to the suspicious activities of Mr. Hodge, Mr. Thomas, and third parties, as described below.

As to Mr. Hodge's second argument, the Sixth Circuit recently reiterated *en banc* the presumption that, "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sanders*, 106 F.4th 455, 465 (6th Cir. 2024) (quotation omitted) (collecting cases).  The court rejected any "bright-line rule" arising from a "thin strand of cases" suggesting that "probable cause can never be satisfied by a warrant affidavit that establishes only that a defendant is a known drug dealer who lives at a certain location." *Id.* (citing *United States v. Brown*, 828 F.3d 375, 383–84 (6th Cir. 2016); *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)).  "All things being equal, it is reasonable to assume that a person keeps his possessions where he resides" in any common-sense inquiry into probable cause.  *Id.* at 447 (quotation omitted).  Moreover, it is also reasonable to assume that "records of illegal business activity" and "personal financial records" are "usually kept at either a business location or at the defendant's home." *United States v. Abboud*, 438 F.3d 554, 573–74 (6th Cir. 2006).

Here, the affidavit describes Mr. Hodge traveling from near the Omega Avenue business to A Touch of Italy, where the suspected drug money drop with Mr. Thomas occurred on September 19, 2022.  (ECF No. 95-1, ¶ 47, PageID #514; ECF No. 129-1, ¶ 47, PageID #2550.)  After this exchange, Mr. Hodge drove to the Timberline Trail residence.  (ECF No. 95-1, ¶ 62, PageID #516; ECF No. 129-1, ¶ 62, PageID #2550); *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) (finding that commission of a drug transaction occurring away from a house and then one participant returning to the house "plainly demonstrated a sufficient nexus with the house"); *see also United States v. Miller*, 850 F. App'x 370, 373–74 (6th Cir. 2021) (collecting cases demonstrating principle that nexus is satisfied when defendant takes components of drug transaction to or from residence).

Phone records showed that a third party involved in the Drug Enforcement Administration's $250,000 undercover money pickup operation had seven contacts with one of Mr. Hodge's phone numbers on October 25, 2022, the day of the pickup.  (ECF No. 95-1, ¶ 95, PageID #526; ECF No. 129-1, ¶ 95, PageID #2562.)  Ping notifications on Mr. Hodge's cell phone and GPS tracking on Mr. Hodge's vehicle showed that he was at the Omega Avenue business that same day.  (ECF No. 95-1, ¶¶ 96–98, PageID #526; ECF No. 129-1, ¶¶ 96–98, PageID #2562.)  Defendant contends that these events did not, in fact, take place.  But a factual dispute over those events properly belongs to the jury.  On this motion to suppress, the inquiry focuses on probable cause for the search.  But even without these facts, ample probable cause supports the issuance of the warrant.

A search of Mr. Hodge's phone revealed communications with a Mexican number, which the affiant believed to be connected to drug activity. (ECF No. 95-1, ¶¶ 38 & 148, PageID #512 & #537; ECF No. 129-1, ¶¶ 38 & 148, PageID #2548 & #2573.) Mr. Hodge used this phone to communicate with the Mexican number while he was at the Timberline Trail residence. (ECF No. 95-1, ¶ 40, PageID #512; ECF No. 129-1, ¶ 40, PageID #2548.)

Also, the affidavit describes Mr. Hodge frequently driving the Ford Escape, which the affiant believed was used to store and transport drug money, to the Omega Avenue business. (ECF No. 95-1, ¶¶ 63, 70, 97, 98, & 137, PageID #516, #520, #526 & #534; ECF No. 129-1, ¶¶ 63, 70, 97, 98 & 137, PageID #2552, #2562 & #2570.) Mr. Hodge regularly parked the Ford Escape at the Timberline Trail residence (ECF No. 95-1, ¶¶ 77, 78, 81, 83, 134, 141, & 143, PageID #522, #523, #534 & #535; ECF No. 129-1, ¶¶ 77, 78, 81, 83, 134, 141 & 143, PageID #2558, #2559, #2570 & #2571) and later stored it at the Omega Avenue business (ECF No. 95-1, ¶ 108, PageID #528–29; ECF No. 129-1, ¶ 108, PageID #2564–65).

Finally, the affidavit describes a meet-up between Mr. Hodge and the driver of a black Porsche that occurred at the Omega Avenue business. (ECF No. 95-1, ¶¶ 96–104, PageID #526–28; ECF No. 129-1, ¶¶ 96–104, PageID #2562–64.) This meet-up occurred the same day that law enforcement suspected Mr. Hodge became aware of surveillance. (ECF No. 95-1, ¶¶ 111 & 143, PageID #529 & #535; ECF No. 129-1, ¶¶ 111 & 143, PageID #2565 & #2571.) This black Porsche had been seen with Mr. Hodge on other occasions—including driving together to A Touch of Italy

32

(the location of Mr. Hodge's and Mr. Thomas's suspected drug money drop) from the Omega Avenue business.  (ECF No. 95-1, ¶¶ 70–73, PageID #520–21; ECF No. 129-1, ¶¶ 70–73, PageID #2556–57.)

In response to the allegations of a nexus between the conduct alleged in the affidavit and the places to be searched, Defendant likens his case to *Brown*, characterizing his case as one featuring an affidavit containing "no evidence that [he] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there."  828 F.3d at 383.  But his reliance is misplaced.  Here, the search warrants did not focus on seizing narcotics; they focused on seizing "[b]ooks, records, receipts, bank statements, and records . . . relating to [the] distribution of controlled substances," and electronics which might contain those records.  (ECF No. 110-1, PageID #843–44 & #851–52.)  The affidavit provides a sufficient basis to believe that Mr. Hodge's "records of illegal business activity" would be found at his home or place of business.  *Abboud*, 438 F.3d at 573–74; *see also United States v. Williams*, 544 F.3d 683, 686–87 (6th Cir. 2008) (finding it reasonable to suppose some criminals may store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there).

Unlike *Brown*, the affiant does not describe Mr. Hodge as an unsophisticated or one-off drug dealer.  *Brown*, 828 F.3d at 378–80.  Instead, the affidavit describes him as a suspected member of a drug trafficking organization involved in "continual and ongoing operations . . . involving large amounts of drugs"—and one who evidences

considerable sophistication at that.  *Sanders*, 106 F.4th at 466 (cleaned up) (quoting *United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021)).

Considering the totality of the circumstances and affording appropriate deference to the Magistrate Judge's probable cause determination—including giving considerable weight to the "conclusion of experienced law enforcement officers," *United States v. Mick*, 263 F.3d 553, 566 (6th Cir. 2001)—the Court determines that there was a sufficient nexus between the evidence sought in the warrant application, the Timberline Trail residence, and the Omega Avenue business.

The nexus requirement does not require that law enforcement have unassailable, direct knowledge that evidence of illegal activity will be found at the target location.  *Sanders*, 106 F.4th at 462.  Here, law enforcement presented the Magistrate Judge with sufficient evidence to support a "practical common-sense" conclusion that "there [was] a fair probability that contraband or evidence of a crime [would] be found" at the Timberline Trail residence and the Omega Avenue business. *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004).

### II.B.2. Stale Information

Mr. Hodge argues that the warrant fails to establish probable cause because it relied on stale information:  a text conversation between Mr. Hodge and Mr. Thomas which occurred on November 19, 2021—some eleven months before the searches at issue.  (ECF No. 95-1, ¶ 65, PageID #517–18; ECF No. 129-1, ¶ 65, PageID #2553–54.) The United States responds that this text conversation was "corroborated by fresh information, including [Mr. Hodge's and Mr. Thomas's] suspected drug money transfer" in September 2022, the September 28th searches of Mr. Thomas's

residences where drugs, firearms, cell phones, and pill-pressing items were found, and the continued surveillance of Mr. Hodge.  (ECF No. 110, PageID #818–19.)

As a general matter, stale information cannot be considered in a probable cause determination.  *United States v. Frechette*, 583 F.3d 374, 377–78 (6th Cir. 2009).  Whether information is stale depends on factors such as the "inherent nature of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?)."  *United States v. Hammond*, 351 F.3d 765, 771 (6th Cir. 2003) (quoting *United States v. Greene*, 250 F.3d 471, 480–81 (6th Cir. 2001).    Additionally, "[t]he probable cause determination cannot be measured in a vacuum, but rather must be viewed together and in totality with the events immediately preceding the search.   Recent events can serve to refresh otherwise stale information."  *United States v. Redmond*, 475 F. App'x 603, 610 (6th Cir. 2017).

While the text conversation at issue would not support a finding of probable cause on its own, due to its age and oblique references to narcotics, subsequent events described in the affidavit support law enforcement's belief that Mr. Hodge was engaged in an ongoing drug conspiracy and that evidence of this conspiracy would be found at his place of residence and his business.  Furthermore, each of the *Hammond* factors weigh against staleness in this case.  The crime alleged is a "regenerating conspiracy," not a one-off encounter.  *See Hammond*, 351 F.3d at 771.  The things to

35

be seized—business records, money, and the like—tend, unlike drugs, to be present at the same location for extended periods of time. And the places to be searched were not "forums of convenience" but suspected bases of operations, where those records would reasonably be kept. *See id.*; *Abboud*, 438 F.3d at 573–74.

The Court does not view the text exchange in a vacuum. Instead, when viewed in conjunction with the other evidence, observations, and conclusions that the affiant offered, the Court finds that the text exchange was reinforced and refreshed by more recent evidence. *See Redmond*, 475 F. App'x at 610. Its inclusion in the affidavit does not defeat a determination of probable cause.

### II.B.3. Request for a *Franks* Hearing

Next, Defendant requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), alleging that law enforcement "misled the Magistrate Judge by including" false and misleading statements in the affidavit for searches of the Timberline Trail residence and the Omega Avenue business. (ECF No. 92, PageID #466.) Defendant identifies 22 paragraphs that he alleges contain false and misleading information. Additionally, he identifies several omissions that he believes law enforcement should have included in the affidavit and argues that their exclusion warrants suppression.

A defendant is entitled to an evidentiary hearing, known as a *Franks* hearing, if he (1) "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *United States v. Green*, 572 F. App'x 438, 441 (6th Cir.

36

2014) (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001)).  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.  The Sixth Circuit characterizes this standard as a "heavy burden." *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).  And in the case of a material omission, as opposed to an allegedly false affirmative statement, a defendant must satisfy an even higher bar to obtain a hearing.  *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).  "[A] Franks hearing is only merited in cases of omissions in 'rare instances.'" *Graham*, 275 F.3d at 506 (citation omitted).

### II.B.3.a. Paragraph 13

Paragraph 13 of the affidavit states:

I am currently part of another active DEA investigation regarding the distribution of illicit narcotics involving methamphetamine pills. Members of this drug trafficking organization are obtaining large kilogram quantities of compression binder from an online retail website. During the course of the investigation investigators have seized multi-pound quantities of crystal methamphetamine intended for members of the DTO.  As recently as July 2022, investigators seized approximately 1,000 multi-colored pills pressed into various shapes from a member of the DTO.  The DEA North Central Laboratory analysis of these multicolored pills identified the pills contained methamphetamine. Additionally, I was informed by a DEA Supervisory Chemist that since January of 2022, other DEA offices have submitted drug exhibits of similar multicolored pills which contained methamphetamine as well as caffeine.

(ECF No. 95-1, ¶ 13, PageID #503–04; ECF No. 129-1, ¶ 13, PageID #2539–40.)

Mr. Hodge argues that documents produced by the United States demonstrated that "there was no such seizure of pills or narcotics intended for any member of the DTO or from a member of [Mr. Thomas and Mr. Hodge's] DTO prior to, and/or in July of 2022."  (ECF No. 92, PageID #467.)  The United States contends that this paragraph describes the affiant's attempt to provide context on how pill binding works and that the first sentence of the paragraph directly states that this information was revealed through "another active DEA investigation regarding the distribution of illicit narcotics involving methamphetamine pills."  (ECF No. 95-1, ¶ 13, PageID #503; ECF No. 129-1, ¶ 13, PageID #2539.)  Even if the paragraph described the investigation in this case, the United States maintains that it is not false because law enforcement subsequently seized large quantities of pills at Mr. Thomas's residence.

Read in context, this paragraph is part of a subsection of the affidavit providing background on "Compression Binder, Pill Presses, and Illicit Narcotics."  (ECF No. 95-1, PageID #502; ECF No. 129-1, PageID #2538.)  The immediately preceding paragraph includes information about Mr. Thomas's drug trafficking organization and defines the acronym as "DTO."  (ECF No. 95-1, ¶ 12, PageID #503; ECF No. 129-1, ¶ 12, PageID #2539.)  The beginning of the following paragraph makes clear that the affiant is describing the activities of "another active DEA investigation," not the drug trafficking organization at issue in this case.  (ECF No. 95-1, ¶ 13, PageID #567.)  Additionally, the end of the paragraph describes a Drug Enforcement Administration laboratory discovering methamphetamine and caffeine

in multi-colored pills in *other* investigations.  (ECF No. 95-1, ¶ 13, PageID #503–04; ECF No. 129-1, ¶ 13, PageID #2539–40.)

Nothing in this paragraph purports to describe the drug trafficking organization at issue or the suspected activities of Mr. Hodge.  While the affiant uses the same "DTO" acronym in both paragraphs 12 and 13, that usage is not false or misleading.  Even if the affiant intended to use the acronym to describe only the drug trafficking organization in this case, and not any other drug trafficking organization, its inclusion amounts, at most, to negligence or innocent mistake.  Allegations of an agent's negligence or innocent mistake do not warrant a *Franks* hearing.  *Franks* 438 U.S. at 171.  "[A] little negligence—actually even a lot of negligence—does not the need for a *Franks* hearing make."  *United States v. Swanson*, 210 F.3d 788, 791 (7th Cir. 2000).

### II.B.3.b. Paragraph 29

Paragraph 29 describes surveillance of Mr. Thomas retrieving a UPS package containing 21 kilograms of compression pill binder and traveling "back and forth between Target Location 1 and Target Location 2."  (ECF No. 95-1, ¶ 29, PageID #508–09; ECF No. 129-1, ¶ 29, PageID #2544–45.)  Defendant argues that this statement is false because references to "Target Location 1 and Target Location 2" were used by the same affiant not only to describe Mr. Hodge's residence and place of business, but also to describe two locations associated with Mr. Thomas.  (ECF No. 92, PageID #467–68.)  He argues that use of "Target Location 1" and "Target Location 2" to describe four separate locations was improper and warrants suppression.

39

The United States responds that this paragraph was copied verbatim from the affidavit supporting the search of Mr. Thomas's residences—a point Mr. Hodge also emphasizes.  Additionally, the surrounding paragraphs clearly relate to surveillance of Mr. Thomas.  Also, the United States observes that all references to Mr. Hodge's "Target Location 1" and Target Location 2" appear in bold, while references to Mr. Thomas's target locations appear in regular type.

The terms "Target Location 1" and "Target Location 2" are defined and bolded throughout the affidavit when referring to the Timberline Trail residence and the Omega Avenue business.  (*See, e.g.*, ECF No. 95-1, ¶¶ 9, 39, & 70, PageID #502, #517 & #520; ECF No. 129-1, ¶¶ 9, 39 & 70, PageID #2538, #2548 & #2556.)  The only times "Target Location 1" or "Target Location 2" appear in regular type are in Paragraphs 29 and 34—the paragraphs describing the activities of Mr. Thomas.

Paragraph 29 appears in the subsection of the affidavit titled "Surveillance and Delivery of Compression Binder on September 29, 2022."  (ECF No. 95-1, PageID #508; ECF No. 129-1, PageID #2544.)  Portions of this section were taken from the affidavit supporting the searches of Mr. Thomas's residences, which were written by the same affiant and signed by the same Magistrate Judge.  (*See* ECF No. 92, PageID #468–69.)  The remainder of this subsection and the next subsection describe surveillance of Mr. Thomas only, as well as the subsequent searches of his two residences.  If the affiant intended to suggest that law enforcement officials observed Mr. Thomas at the Timberline Trail residence or the Omega Avenue business, that would be a point worth emphasizing in support of probable cause.  The affidavit does

not so suggest. Indeed, the involvement of the same Magistrate Judge in each warrant serves to minimize any confusion about the locations to be searched.

In the next subsection, "Search Warrants on September 28, 2022," which describes the searches of Mr. Thomas's residences, the affiant uses "Target Location 1"—not bolded—to describe a search warrant authorized by the Magistrate Judge to search the cellphones "seized at THOMAS' residence." (ECF No. 95-1, ¶ 34, PageID #510; ECF No. 129-1, ¶ 34, PageID #2546.) Read in context, "Target Location 1" is here synonymous with "THOMAS' residence" in the following sentence. Mr. Hodge does not allege that this subsection describes any search of his residence. Nor does Mr. Hodge argue that use of the bolded target location terms elsewhere was false or misleading.

Although the affiant might have proofread more carefully, the record does not support the conclusion that the non-bold references to "Target Location 1" and "Target Location 2" in Paragraphs 29 and 34 are anything more than typographical errors, carried over from a previous search warrant affidavit. Typographical errors warrant neither a *Franks* hearing nor suppression of any evidence. *United States v. Frazier*, 423 F.3d 526, 539 (6th Cir. 2005).

### II.B.3.c. Paragraphs 88, 94, and 95

Paragraph 88 describes the GPS tracking of the movements of Mr. Hodge's Ford Escape on East 74th Street in Cleveland and then a highway. (ECF No. 95-1, ¶ 88, PageID #524; ECF No. 129-1, ¶ 88, PageID #2560.) This paragraph also recounts that an investigator observed a "dark colored Land Rover" with a partial license plate of "JTD1" near the same area on East 74th Street shortly after Mr.

41

Hodge drove away. (ECF No. 95-1, ¶ 88, PageID #524; ECF No. 129-1, ¶ 88, PageID #2560.) Paragraph 94 describes a $250,000 undercover money pickup operation involving a third party. (ECF No. 95-1, ¶ 94, PageID #525; ECF No. 129-1, ¶ 94, PageID #2561.) Paragraph 95 describes pen register data showing that one of Mr. Hodge's phone numbers had "approximately 7 contacts" with that third party on the day of the pickup operation. (ECF No. 95-1, ¶ 95, PageID #526; ECF No. 129-1, ¶ 95, PageID #2562.)

Defendant argues that the "pen register data provided to defense counsel for [his phone number] does not indicate that there were any contacts with [the third party's phone], or any other individual on October 25, 2022" and that there was no other evidence tying Mr. Hodge to that third party, so information regarding the pickup operation should not have been included in the warrant. (ECF No. 92, PageID #470.) The United States responds that, "[f]rom speaking to its DEA case agent, the government's understanding is that there was a lapse in storing or saving pen register data from [Mr. Hodge's phone]" on the date of the pickup. (ECF No. 110, PageID #826.) Because pen register data "is provided in real time" and toll records are historical, the agents saw the seven contacts on the pen register when the affidavit was drafted. (*Id.*, PageID #827.) Subsequent toll records for Mr. Hodge's phone confirmed the seven contacts with the third party's phone on that day. (*Id.*; ECF No. 110-3, PageID #855–56.)

The toll records that the United States supplied support the affiant's statement that Mr. Hodge's phone had seven contacts with the third party involved in the pickup

operation on October 25, 2022. (ECF No. 110-3, PageID #855–56.) Defendant does not contest the fact that the toll records in fact show the October 25, 2022 contacts. Therefore, the allegations in Paragraph 95 are not false, and inclusion of information about the pickup operation supports the Magistrate Judge's probable cause determination. Any error from the inclusion of this information in the affidavit, and the Court detects none, does not warrant a *Franks* hearing or suppression. *See Frazier*, 423 F.3d at 539.

### II.B.3.d. Paragraphs 44 and 63

Paragraph 44 provides that on September 18, 2022, "at approximately 11:11 P.M., a series of 3 contacts occurred between" Mr. Thomas's phone and one of Mr. Hodge's phone numbers. (ECF No. 95-1, ¶ 44, PageID #513; ECF No. 129-1, ¶ 44, PageID #2549.) Paragraph 63 describes the affiant's conclusions and beliefs regarding what occurred during Mr. Thomas and Mr. Hodge's meet-up at A Touch of Italy on September 19, 2022 and states that, on the following day, "kilogram quantities of various colors of compression binder and caffeine were delivered to [Mr. Thomas]." (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552.)

Defendant contends that it was misleading to describe a "series" of contacts when "pen register information for September 18, 2022, shows that there was an outgoing call that was 0:00:00 minutes, an incoming call that was 0:00:00 minutes, and an incoming call that was 0:00:56 minutes." (ECF No. 92, PageID #470.) Therefore, there was only one "short contact" between Mr. Thomas and Mr. Hodge, not three. (*Id.*) Because the affidavit specifies that the contacts occurred between

43

the respective phones and does not allege three actual conversations between Mr. Thomas and Mr. Hodge, the Court construes this argument as Mr. Hodge's effort to clarify the record rather than contend that the information is false.  The Court will discuss the distinction between "contacts" and "communications" further below.

Defendant also claims that the affiant "falsely included the assumption in [Paragraph 63]" that Mr. Hodge and Mr. Thomas met up in the early morning hours of September 29, 2022 "without one piece of actual evidence to support his sweeping conclusion."  (ECF No. 92, PageID #471.)  The United States responds by emphasizing that the statements in this paragraph are the affiant's beliefs, not factual statements—as indicated by his use of "I believe" before every sentence not otherwise corroborated by other evidence or observations.  (ECF No. 110, PageID #829 (citing ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63 PageID #2552).)  Additionally, whether Mr. Hodge and Mr. Thomas actually met to exchange drugs in the early morning of September 19, 2022 is "largely immaterial to the probable cause for searching [Mr. Hodge's] residence and business" because the "important point is the affiant's belief" about what occurred later in the A Touch of Italy parking lot and Mr. Hodge's return to his residence thereafter.  (*Id.*, PageID #829.)

Contrary to Defendant's arguments, the affiant never stated that he had direct evidence that Mr. Hodge and Mr. Thomas met during the early hours of September 19, 2022.  Instead, he merely stated that, based on the phone contacts and Defendants' subsequent meet up in the afternoon on September 19, 2022, he *believed* that they had met up to exchange narcotics earlier that day.  It is within the

Magistrate Judge's discretion to rely on the inferences and beliefs of the affiant. *Mick*, 263 F.3d at 566.  The affiant's conclusion here is merely an opinion and cannot legitimately be characterized as false or misleading.  *See Blakeney v. United States*, 191 F.3d 451, at *4 (6th Cir. 1999) (unpublished).  Mr. Hodge's disagreement with the affiant's opinion does not make it either false or intentionally misleading.

Moreover, even if the affiant's belief could be characterized as true, false, or unreasonable, Defendant's conclusory assertion that the statement was not true is not enough to warrant a *Franks* hearing.  *Franks*, 438 U.S. at 171.  Mr. Hodge must make an offer of proof to support his allegations of falsity, beyond a mere desire to cross examine the affiant.  *Id.*  He has not made such a showing.  Accordingly, Defendant is not entitled to a *Franks* hearing on this basis.

### II.B.3.e. Paragraphs 46 and 48

Paragraphs 46 and 48 describe several phone "contacts" between Mr. Thomas and Mr. Hodge occurring on September 19, 2022 (the day of the meet-up in the parking lot at A Touch of Italy) based on ping warrant data.  (ECF No. 95-1, ¶¶ 46 & 48, PageID #513 & #514; ECF No. 129-1, ¶¶ 46 & 48, PageID #2549 & #2550.) Defendant argues that the affidavit was misleading because the "series of contacts" between Defendants mostly consisted of "unanswered phone calls."  (ECF No. 92, PageID #471.)  Specifically, Mr. Hodge argues that "[p]en register information for [this date] shows that there were only three [] answered calls," as opposed to the 19 other contacts that had no duration.  (*Id.*)

The United States responds that it is the "government's understanding [] that when DEA's pen register system shows a call duration of 0:00:00, that reflects either

a missed call or a text message." (ECF No. 110, PageID #830.) Therefore, Mr. Hodge's assumption that a "contact" with a duration of 0:00:00 could only refer to a missed call and not to a text message, is incorrect. (*Id.*) Even if a "contact" with a duration of 0:00:00 could only refer to missed calls, the United States argues that Mr. Hodge fails to demonstrate how the affiant's use of that term is false or misleading. (*Id.*)

Defendant takes issue with the language the affiant uses to describe pen register entries with no duration. He appears to equate "contact" with "communication," such that describing an entry as a "contact" implies that he and Mr. Thomas actually spoke on each of those occasions, which would be false. (ECF No. 92, PageID #472.) In any event, describing a non-duration entry of this sort as a "contact" is not false because, whatever the entry represented—a missed call, a text message, another notification, or something else entirely—Mr. Hodge does not dispute that there was at least some contact between his phone and Mr. Thomas's phone at those times. As it stands, the affidavit does not represent that Mr. Hodge and Mr. Thomas spoke on those occasions.

Even if there were a more precise way to describe these entries, mere imprecisions do not warrant a *Franks* hearing. *See Franks* 438 U.S. at 171. Defendant's attempt at wordsmithing the affidavit fails to demonstrate that the affiant harbored a deliberate intent to deceive. Use of the term "contacts" in these paragraphs does not entitle Mr. Hodge to a *Franks* hearing.

### II.B.3.f. Paragraphs 51–57

Paragraphs 51 to 57 describe law enforcement's observations of Mr. Thomas and Mr. Hodge's meet-up at A Touch of Italy on September 19, 2022. (ECF No. 95-1,

¶¶ 51–57, PageID #514–15; ECF No. 129-1, ¶¶ 51–57, PageID #2550–51.)  Defendant requests an evidentiary hearing to establish "what exactly law enforcement . . . observed on September 19, 2022" and raises several objections to the affiant's statements in these paragraphs.  (ECF No. 92, PageID #472.)

*First*, Mr. Hodge argues that "there was no communication between [his phone number] and [Mr. Thomas] between 13:46:23 and 22:07:37 on September 19, 2022"; therefore, any allegation that Mr. Thomas and Mr. Hodge talked to each other at 2:14 p.m., 2:15 p.m., and 2:17 p.m. is false.  (*Id.*)  The United States responds that "the pen register data that [Mr.] Hodge attached to his motion confirms that there were contacts between those two numbers [between 13:46:23 and 22:07:37]."  (ECF No. 110, PageID #831.)

The pen register data shows an entry on September 19, 2022 from 22:07:16 to 22:07:37 between Mr. Hodge's phone number and Mr. Thomas's phone number.  (ECF No. 92-5, PageID #486.)  The data also shows an entry on September 19, 2022 from 13:45:57 to 13:46:23 between Mr. Hodge's phone and Mr. Thomas's phone.  (*Id.*)  This record correlates with the affiant's allegation in Paragraph 52 that, around 1:43 p.m., Mr. Hodge's phone "received an incoming call from [Mr. Thomas]."  (ECF No. 95-1, ¶ 52, PageID #514; ECF No. 129-1, ¶ 52, PageID #2550.)  Therefore, the pen register data rebuts Mr. Hodge's argument regarding Paragraphs 51 and 52.

Paragraph 54 notes that Mr. Hodge was seen talking on a cell phone at 2:14 p.m. when exiting A Touch of Italy.  (ECF No. 95-1, ¶ 54, PageID #515; ECF No. 129-1, ¶ 54, PageID #2551.)  Paragraph 56 states that, upon Mr. Thomas's arrival

47

at his residence on Father Caruso Drive at 2:15 p.m., he was seen talking on a cell phone.  (ECF No. 95-1, ¶ 56, PageID #515; ECF No. 129-1, ¶ 56, PageID #2551.) Paragraph 57 states that Mr. Hodge "was seen getting off the phone and walking back inside [A Touch of Italy]" at 2:17 p.m.  (ECF No. 95-1, ¶ 57, PageID #515; ECF No. 129-1, ¶ 57, PageID #2551.)   Contrary to Defendant's claim, nowhere in the affidavit does the affiant claim that Mr. Hodge and Mr. Thomas were talking to each other at 2:14 p.m., 2:15 p.m., or 2:17 p.m.  Even Paragraph 63, which describes the affiant's conclusions about the September 19, 2022 surveillance, does not suggest that Mr. Thomas and Mr. Hodge were speaking on the phone at any of those times.  (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #516.)  Defendant fails to demonstrate that any of these statements was false or intentionally misleading.

*Second*, Defendant argues that "law enforcement unlawfully obtained prospective cell site location information in paragraph [] 55."  (ECF No. 92, PageID #472.)  The United States responds that this argument is a "legal claim" that falls outside the scope of a *Franks* hearing because it does not assert that any factual information in that paragraph was false or misleading.  (ECF No. 110, PageID #833.) The United States is correct that Mr. Hodge's argument does not present a *Franks* inquiry.  Defendant does not contest that the cell site location data placed his phone near A Touch of Italy on September 19, 2022.  *Franks* hearings are predicated upon the affiant's inclusion of allegedly false or misleading factual statements in a warrant affidavit.  A *Franks* hearing is not warranted on the basis of this argument because

Mr. Hodge does not argue that Paragraph 55 contains a false or intentionally misleading factual statement.

*Third*, Defendant argues that there was no face-to-face meeting between him and Mr. Thomas on September 19, 2022, there was no evidence of any exchange between the parties on that day, and the window tint on the vehicles would have obscured law enforcement's observations of what happened.  (ECF No. 92, PageID #472.)  The United States argues that the window tint was not relevant to the facts stated in the affidavit, which described Mr. Thomas entering and exiting Mr. Hodge's Ford Escape—not what transpired inside.  (ECF No. 110, PageID #831–32.)  Although the affiant later stated his belief regarding Mr. Thomas's activities inside the Ford Escape, that statement of belief was separate from the earlier factual statement.  (*Id.* at 832.)

The affiant does not allege that Mr. Hodge and Mr. Thomas had a face-to-face meeting on September 19, 2022 at A Touch of Italy or that Mr. Thomas *actually* distributed or picked up narcotics or narcotics proceeds from Mr. Hodge's Ford Escape.  Instead, based on his "training and experience and knowledge of the investigation," the affiant stated his belief that Mr. Thomas entered Mr. Hodge's vehicle "to place narcotics proceeds into a hidden compartment or 'trap.'"  (ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552 (emphasis added).)  The affiant's beliefs cannot serve as the subject of a *Franks* hearing if they are not otherwise based on false statements.  Further, Defendant does not argue that the affiant's descriptions of Mr. Thomas's actions (entering the Ford Escape, sitting

inside it, and later exiting the car—none of which involves seeing through the tinted windows) were inaccurate.

Fundamentally, Defendant challenges the conclusions that the affiant drew based on what law enforcement observed on September 19, 2022. Defendant's request to examine "TFO Lori Baker-Stella and SA Shawn Moses" (ECF No. 92, PageID #472) underscores his "mere desire to cross-examine" these individuals, *Franks*, 438 U.S. at 171, and does not satisfy his "heavy burden" to demonstrate that the affiant made a knowing falsehood in the affidavit. *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). Accordingly, Defendant is not entitled to a *Franks* hearing based on Paragraphs 51 through 57 of the affidavit.

### II.B.3.g. Paragraphs 63 and 149

Paragraph 63 provides the affiant's conclusions about what occurred on September 19, 2022 at A Touch of Italy:

> Based upon my training and experience and knowledge of the investigation, I believe THOMAS met up with HODGE during the early morning hours of September 19, 2022 to acquire crystal methamphetamine from HODGE in order to press methamphetamine pills which were subsequently seized by investigators on September 28, 2022 at THOMAS' residence. Additionally, based upon the above surveillance of THOMAS and HODGE on September 19, 2022, I believe THOMAS entered HODGE's vehicle in order to place narcotics proceeds into a hidden compartment or "trap" in HODGE's vehicle for the crystal methamphetamine HODGE provided to THOMAS earlier in the day. Additionally, I believe HODGE took the narcotics proceeds acquired from THOMAS on September 19, 2022 to **Target Location 1** based upon the surveillance as described above. The following day September 20, 2022, kilogram quantities of various colors of compression binder and caffeine were delivered to SHERMAN THOMAS.

(ECF No. 95-1, ¶ 63, PageID #516; ECF No. 129-1, ¶ 63, PageID #2552.)

50

Paragraphs 147 to 151 summarize the affiant's conclusions and beliefs, based on his observations, experience, and other evidence, about Mr. Hodge and his suspected role in a drug conspiracy.  (ECF No. 95-1, ¶¶ 147–51, PageID #537–39; ECF No. 129-1, ¶¶ 147–51, PageID #2573–75.)  Specifically, Paragraph 149 describes how law enforcement targeted the Omega Avenue business as a location that might contain evidence of narcotics transactions.  (ECF No. 95-1, ¶ 149, PageID #538; ECF No. 129-1, ¶ 149, PageID #2574.)  Defendant objects to the second sentence in that paragraph, which begins with the phrase, "Prior to HODGE's narcotics transaction with Sherman THOMAS in September 2022 . . . ."  (ECF No. 95-1, ¶ 149, PageID #538; ECF No. 129-1, ¶ 149, PageID #2574.)  Defendant contends that this phrase contains a false statement because the affiant did not have any "evidence that there was a narcotics transaction between Hodge and Thomas in September 2022."  (ECF No. 92, PageID #474 (quoting ECF No. 95-1, ¶ 149, PageID #538; ECF No. 129-1, ¶ 149, PageID #2574).)  He also argues that the "unsupported allegation" in both paragraphs that "agents suspect there is a hidden compartment located with the Ford Escape which [Mr. Hodge] utilizes to conceal narcotics as well as narcotics proceeds" warrants suppression.  (*Id.*, PageID #473–74 (quoting ECF No. 95-1, ¶ 149, PageID #538; ECF No. 129-1, ¶ 149, PageID #2574).)

In response, the United States maintains that these statements constitute reasonable inferences and conclusions based on observed facts.  "[T]he affidavit was careful to separate *factual* statements (that [Mr.] Thomas entered [Mr.] Hodge's

51

parked Ford Escape after their series of phone contacts) from *belief* statements (that [Mr.] Thomas left drug money in Hodge's Ford Escape)."  (ECF No. 110, PageID #832.)

As previously discussed, warrants do not require direct evidence because affiants are entitled to draw reasonable inferences from circumstantial evidence—and the Magistrate Judge is entitled to rely on those inferences to make a determination of probable cause.  Here, the affiant's inferences logically flow from observations and other direct evidence, and his beliefs cannot constitute false statements.  *Blakeney*, 191 F.3d 451, at *4.  The context and phrasing of Paragraphs 63 and 149 confirm that these paragraphs set forth the affiant's conclusions and beliefs.  The affiant does not allege that law enforcement observed Mr. Thomas drop narcotics proceeds in a trap door or secret compartment in the Ford Escape.  Instead, based on the affiant's knowledge, experience, and other information from this investigation, he believed that Mr. Thomas placed narcotics proceeds in the vehicle.  Defendant proffers no evidence that would warrant a *Franks* hearing.

### II.B.3.h.  Paragraphs 39, 47, 55, and 149

Defendant incorporates by reference his arguments that the cell site information for his phone number was unlawfully obtained and that its inclusion "warrants suppression of the illegal search that occurred at the residence and the business."  (ECF No. 92, PageID #474–75.)  Paragraphs 47, 55, and 149 reference "prospective cell site location information" for one of Mr. Hodge's phone numbers, which placed him near either A Touch of Italy or the Omega Avenue business.  (ECF No. 95-1, ¶¶ 47, 55 & 149, PageID #514, #515 & #538; ECF No. 129-1, ¶¶ 47, 55 & 149, PageID #2550, #2551 & #2574.)  Paragraph 39 does not include a reference to

cell site information.  (ECF No. 95-1, ¶ 39, PageID #512; ECF No. 129-1, ¶ 39, PageID #2548.)  The United States argues that Defendant cannot use a *Franks* hearing to address his claim about allegedly unlawful cell site evidence because he does not challenge the truth of any factual statement in the affidavit.  (ECF No. 110, PageID #833.)

A *Franks* hearing provides the defendant a "limited right" to challenge the truthfulness of statements in an affidavit supporting a warrant.  *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008); *Franks*, 438 U.S. at 167–68 (describing the hearing as a "post-search veracity challenge").  *Franks* is not an alternative means to cross-examine witnesses or suppress evidence without allegations of intentional falsehood or the affiant's "reckless disregard for the truth."  *Franks*, 438 U.S. at 170–71.  Defendant's arguments regarding these paragraphs do not bear on the truthfulness of the affidavit itself.  He does not argue that these paragraphs contain false information or that law enforcement misrepresented the cell site location data in the affidavit.  Accordingly, a *Franks* hearing is not the appropriate forum to contest the truthfulness or accuracy of this information.

### II.B.3.i. Omissions

Defendant argues that the affidavit failed to include several pieces of relevant information.  (ECF No. 92, PageID #475–76.)  As with affirmative statements, a defendant seeking a *Franks* hearing based on an omission must "make a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit" and that the affidavit would not support probable cause had the omitted material been considered.

*Fowler*, 535 F.3d at 415.   Even where the Court finds the omitted information "potentially exculpatory," the affidavit is still "less likely to present a question of impermissible official conduct than one which affirmatively includes false information."  *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citing *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)).

*First*, Defendant argues that it was wrong for the affidavit to include information about others' drug offenses without mentioning his own lack of criminal history.  (ECF No. 92, PageID #475.)  But there is no affirmative duty to state that a suspect in an investigation has no criminal history.  *See United States v. Fisher*, 824 F. App'x 347, 354 (6th Cir. 2020).  Based on the record, the Court cannot say that the affiant's failure to include information about Mr. Hodge's criminal history was done deliberately for improper purposes or with reckless disregard for the truth.  The affiant does not suggest that Mr. Hodge had a criminal history related to drugs or that his criminal history led the affiant to believe there may be evidence of a crime at the two locations.  The absence of criminal history for Mr. Hodge, juxtaposed with descriptions of others' criminal history, does not imply that Mr. Hodge had a criminal history.  If anything, it suggests the opposite.

*Second*, Defendant argues that the affidavit failed to state that he has no connection to Mr. Thomas's Reyburn Road and Father Caruso Drive residences or to Defendants Frank Black and Carvin Cook.  (ECF No. 92, PageID #475–76.)  Again, the law does not impose an obligation for an affiant affirmatively to address the types of information Defendant contends should have been included in the affidavit.

Most of the discussion about the searches of Mr. Thomas's residences in the affidavit provided context and background for the surveillance of Mr. Hodge. The affiant supports his belief that evidence of a crime would be found at Mr. Hodge's residence in part on his meet-up and frequent contacts with Mr. Thomas. The affiant provides a connection to Mr. Thomas's residences: he reported that Mr. Thomas returned to the Father Caruso Drive residence after the A Touch of Italy meet-up and that the package of compression pill binder retrieved by Carvin Cook was found at the Reyburn Road residence. (ECF No. 95-1, ¶¶ 33 & 56, PageID #510 & #515; ECF No. 129-1, ¶¶ 33 & 56, PageID #2546 & #2551.) Further, the affidavit contains no reference to Frank Black—so any omission of details relating to him does not affect probable cause.

More generally, an affiant is not obligated to specify that Mr. Hodge was *not* observed at Mr. Thomas's residences. *See Mays v. City of Dayton*, 134 F.3d 809, 815–16 (6th Cir. 1998). A common sense reading of the affidavit would lead the Magistrate Judge to infer that Mr. Hodge was not observed at those locations because a reasonable reader would not invent that fact. Instead, a reasonable reader would expect the affidavit to mention Mr. Hodge's presence at two locations containing kilogram quantities of drugs if that information existed. Moreover, Defendant provides no allegation that this omission was intentional, made with reckless disregard for the truth, or central to the finding of probable cause.

*Third*, Defendant challenges Paragraph 108 of the affidavit, arguing both that the affiant omitted relevant information and that a portion of the paragraph is

materially false.  Mr. Hodge raised this issue at oral argument and in supplemental briefing, relying on information the United States provided after the close of briefing. (ECF No. 133, PageID #2637–39; ECF No. 134.)

Paragraph 108 describes surveillance conducted on the Omega Avenue business from November 11, 2022 to November 24, 2022.  (ECF No. 95-1, ¶ 108, PageID #528–29; ECF No. 129-1, ¶ 108, PageID #2564–65.)  On or about November 16, the affiant reports observing Mr. Hodge "and another unidentified black male" at the Omega Avenue business, where Mr. Hodge's Ford Escape drove into, and later out of, the garage.  (ECF No. 95-1, ¶ 108, PageID #528–29; ECF No. 129-1, ¶ 108, PageID #2564–65.)  Defendant takes issue with the affidavit's characterization of the other man as "unidentified," arguing that the individual was known to the Drug Enforcement Administration at the time and that this characterization is, therefore, a material falsehood.  (ECF No. 134, PageID #2688–90.)

Defendant also argues that the affidavit wrongly omitted the fact that law enforcement stopped the other man after he left the Omega Avenue business, searched his person and vehicle, and found no contraband.  (*Id.*, PageID #2690.)  He contends that law enforcement should have reported that no contraband was recovered from the traffic stop, just as they would have if contraband had been recovered.  (*Id.*, PageID #2691.)  Defendant argues that the absence of contraband on this individual's person or vehicle after meeting with Mr. Hodge cuts against a probable cause determination because "it further shows that [Mr.] Hodge's meeting with this black male had no unlawful purpose."  (*Id.*, PageID #2690.)

Even crediting Defendant's version of events, the Court finds that the affidavit's characterization of the individual as "unidentified" does not present a material falsehood.  Defendant does not explain why the identification of the individual has any bearing on the determination of probable cause.  Nor does the omission of the absence of contraband at the traffic stop meet the *Franks* standard.  As already discussed, in the absence of a claim to the contrary, a reasonable reader would infer that no contraband was discovered.  Although an affirmative statement about the confirmed absence of contraband would be more exculpatory than its omission, such a statement would not necessarily have the effect Defendant contends.  Under the circumstances of the conspiracy charged, the absence of contraband on this particular individual at this particular time does not establish the lawfulness of the individual's meeting with Mr. Hodge.

Accordingly, Defendant fails to meet the high standard for establishing that the omissions from the affidavit merit a *Franks* hearing.  To hold otherwise would open the door to "endless rounds of *Franks* hearings" due to potentially "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit."  *Martin*, 920 F.2d at 398 (citation omitted).

* * *

On the totality of the circumstances set forth in the affidavit, considering each of the foregoing issues individually and collectively, the Magistrate Judge had a substantial basis for determining that probable cause justified issuing the warrant to search the Timberline Trail residence and the Omega Avenue business for items

57

relating to illegal drug trafficking. *See Gates*, 462 U.S. at 238–39. The information

supporting probable cause and issuance of the warrant includes the following:

> Two men took a shipment of pill binder to Mr. Hodge's Bratenahl
> Kitchen business. Mr. Thomas, who also received large quantities of
> pill-binding agents and other material used to manufacture illegal
> narcotics, was in frequent contact with Mr. Hodge. Drawing on his
> experience, the affiant recognized their communication as indicative of
> illegal narcotics activity. Mr. Thomas and Mr. Hodge arranged a meet-
> up in a restaurant parking lot on September 19, 2022, behaving in a
> manner consistent with exchanging narcotics proceeds. Mr. Hodge went
> to the meet-up from the Omega Avenue business and departed for the
> Timberline Trail residence after the meet-up. Nine days later, law
> enforcement searched Mr. Thomas's residence and stash house and
> seized large quantities of drugs and drug paraphernalia, including cell
> phones that Mr. Thomas had used to contact Mr. Hodge. Mr. Hodge's
> phone also had contacts with a third party who dropped off $250,000 in
> drug proceeds to an undercover agent, on the day of the drop-off, while
> Mr. Hodge was at the Omega Avenue business. Mr. Hodge's vehicle was
> in the same place as the vehicle of that third party not long after.
> Mr. Hodge often parked that vehicle at the Omega Avenue business and
> the Timberline Trail residence. And the fact that similar premises
> under Mr. Thomas's control contained evidence of drug activity
> suggested that evidence, such as cell phones, might be found at
> Mr. Hodge's residence and business.

These circumstances show that the Magistrate Judge did not exercise his

authority arbitrarily in approving the searches of Mr. Hodge's business and

residence. Further, none of the statements or omissions that Mr. Hodge identifies as

false or intentionally misleading warrants a *Franks* hearing—individually or taking

their cumulative effect together—because the statements were either not false, not

misleading, not material, or simple typographical errors. For these reasons,

Defendant fails to make a "substantial preliminary showing" of entitlement to a

*Franks* hearing, and the Court declines to order one. *Franks*, 438 U.S. at 170.

## II.C.  Evidentiary Hearing

Defendant also requests an evidentiary hearing.  To the extent he requests the hearing "in order to further [his] arguments" and "address [his] allegations" regarding the allegedly false or misleading statements in the affidavit or to "present additional testimony, evidence, and argument in support of [his] Motion" (ECF No. 92, PageID #466 & 480), the Court finds that his request does not contain "sufficiently definite, specific, detailed, and non-conjectural" factual disputes, *Moore*, 999 F.3d at 999 (citing *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006)).

Defendant identifies only one factual issue—his belief that there could not have been evidence of any exchange between Mr. Hodge and Mr. Thomas on September 19, 2022 because "[t]he window tint on the vehicles would have prohibited law enforcement's conclusions that any drug activity occurred that day."  (ECF No. 92, PageID #472.)  For this reason, Mr. Hodge "requests an evidentiary hearing to establish what exactly law enforcement . . . observed on September 19, 2022."  (*Id.*)  However, as discussed, the affidavit does not rely on any conduct that the tinting obscured.  Instead, it describes Mr. Thomas entering and exiting Mr. Hodge's vehicle, which is observable without seeing through the vehicle's windows.  The affiant's statements of belief about activities inside the Ford Escape do not describe observations of anything inside the vehicle.  Nor do they purport to be.  Because resolution of Defendant's motion does not turn on disputed facts requiring an evidentiary hearing, the Court declines to hold one.

59

### III.    Motion to Compel Production

Finally, Defendant moves to compel production of certain materials under Rule 16 of the Federal Rules of Criminal Procedure.  (ECF No. 122.)  He seeks access to (1) reports, records, and search warrants regarding the October 25, 2022 money pick-up operation described in the affidavit supporting the searches of his residence and business, and (2) redacted reports of an investigation of a third party associated with the investigation of Mr. Hodge.  Defendant argues that the material regarding the money pick-up directly relates to suppression of the searches of his residence and business.  He contests the affidavit's description of the money pick-up and the third party's contacts with Mr. Hodge on the day of the money pick-up, which supported the probable cause determination underpinning the search warrant.  Specifically, he contests whether the pick-up ever occurred and, if so, whether it occurred on October 25, 2022 or a different date.  Also, Defendant argues that disclosing the redacted portions of the reports of the third-party investigation, perhaps under a protective order, would ensure that he has access to all information pertinent to his defense without compromising confidential information.

At oral argument, the United States maintained that the information requested is not discoverable under Rule 16.  The Constitution does not guarantee a general right to discovery for criminal defendants.  *United States v. Sanders*, 106 F.4th 455, 472 (6th Cir. 2024) (en banc) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).  Aside from certain constitutional grounds not implicated here, Rule 16 is the primary means of discovery in criminal cases.  *Id.*  As relevant here, Rule 16 requires disclosure by the United States of documents and objects that are "material

to preparing the defense" or that "the government intends to use . . . in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E)(i)–(ii).  Because the United States represents that it does not intend to use any of the requested production in its case-in-chief, the issue turns on whether the requested production is material to preparing Mr. Hodge's defense under Rule 16.

Earlier this year, the Sixth Circuit addressed this issue in *United States v. Sanders*, 106 F.4th 455 (2024) (en banc).  In *Sanders*, two controlled buys supported an affidavit that secured a warrant to search the defendant's apartment.  *Id.* at 459.  The defendant moved to suppress the items discovered in his apartment and sought disclosure of "case reports" related to the controlled buys.  *Id.* at 472.  The *en banc* court denied the defendant's request for disclosure.  *Id.* at 476.  The Sixth Circuit rejected an argument that the reports would aid his challenges to the warrant authorizing the search of his apartment and his argument that he could use the reports as "background evidence to challenge the investigation's credibility."  *Id.* at 473–75.

Following the Supreme Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996), the Sixth Circuit applies Rule 16 only to "shield claims"—ones that "refute the Government's arguments that the defendant committed the crime charged"—and not to "sword" claims seeking "to challenge the prosecution's conduct of the case."  *Sanders*, 106 F.4th at 473–74 (cleaned up).  Over the dissent's objection, the Sixth Circuit categorized the challenge of the search warrant in *Sanders* as a "sword claim."  *Compare id.* at 475 *with id.* at 497 (Clay, J., dissenting).

61

Further, the Sixth Circuit criticized the defendant's contentions about using the reports as "background evidence."  It viewed that rationale as only an "unsubstantiated theor[y]" that "the reports contain information that casts doubt on the validity of the warrant or would otherwise help him 'explore' or 'discredit' other parts of the investigation."  *Id.* at 475.  To be entitled to discovery, a defendant must offer some evidence as to how that discovery will show that he did not possess the contraband found at his apartment.  *Id.*  Only then could the requested information be material to his defense under Rule 16.  *Id.*

Here, Defendant's motion to compel is materially indistinguishable from the one the Sixth Circuit rejected in *Sanders*.  As in *Sanders*, Defendant seeks general categories of investigative reports and records, both from the money pick-up operation and the third-party investigation.  As in *Sanders*, Defendant seeks only to challenge the government's conduct of the case and does not explain how the discovery he seeks would directly refute the charges against him.  Defendant's arguments that the information he seeks would be helpful to his challenge of the search warrant do not satisfy Rule 16 under the law of this Circuit.

"Were we starting from a blank slate, [Defendant's] reading of the term ['defense'] might carry the day.  After all, in the abstract, a defendant's defense can take many forms beyond a simple response to the Government's case in chief.  But as a [lower] court, we must follow the Supreme Court's precedent."  *Id.* at 474 (cleaned up).  Accordingly, the Court finds that Defendant has not met his burden under Rule 16.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Mr. Hodge's motions to suppress cell site location data (ECF No. 90), to suppress the searches of the Timberline Trail residence and the Omega Avenue business (ECF No. 92), and to compel production of discovery materials (ECF No. 122).

**SO ORDERED.**

Dated:  November 29, 2024

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio

63